UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| ARTHUR ABRAHAM, | Case No. 19-cv-02858-EMC |
|---|---|
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| CINDY BLACK, | Docket No. 1 |
| Respondent. | |

## I. INTRODUCTION

Arthur Abraham filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge the state court's denial of his petition for release from a state hospital to which he had been committed years ago as an insanity acquittee. Respondent has filed an answer to the petition, and Mr. Abraham has filed a traverse. For the reasons discussed below, the petition is denied.

## II. BACKGROUND

A.  California's Not-Guilty-By-Reason-Of-Insanity Procedures

Although this case is limited to an insanity acquittee's effort to get out of a state hospital, it is helpful to understand the basics of California's law for determining whether a person is not guilty by reason of insanity (NGI) as well as the procedures for obtaining release from the hospital after a person has been committed following a determination that he is NGI.

California Penal Code section 1026 provides for a birfurcated trial when a person pleads NGI, with guilt being decided before sanity is decided. If a defendant pleads NGI "and also joins with it another plea or pleas, the defendant shall first be tried as if only the other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed." *Id.* at § 1026(a). If found guilty at that first part of the trial (or if no plea other than NGI is entered), a jury trial then is held to determine whether he was sane at the time of the offense. *Id.* When a criminal defendant is found "insane at

the time the offense was committed," the court generally directs "that the defendant be committed to the State Department of State Hospitals for the care and treatment of the mentally disordered" or an approved private treatment facility. *Id.*

A defendant committed to a state hospital pursuant to section 1026 generally will not be released until the expiration of the maximum term of the commitment or when the committing court determines that the person's sanity has been restored, whichever is shorter.

Cal. Penal Code §§ 1026.1, 1026.2.

The procedures, as relevant here, for obtaining release under California Penal Code section 1026.2 are the following: Either the medical director of the state hospital or the NGI acquittee may apply for the person's release from the hospital "upon the ground that sanity has been restored." *Id.* at § 1026.2(a). An investigation is conducted and reports are prepared; eventually, a hearing is set. *Id.* at § 1026.2(b).

> The court shall hold a hearing to determine whether the person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community. If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year.

*Id.* at § 1026.2(e). The conditional release program is often referred to as CONREP. At the end of a year in CONREP for the insanity acquittee, the court holds another trial to determine if "sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder." *Id.* At the hearing, the applicant has "the burden of proof by a preponderance of the evidence." *Id.* at § 1026.2(k).

B.  <u>Mr. Abraham Was Found To Be NGI In 1985</u>

Mr. Abraham is currently in custody at Napa State Hospital as a result of findings in two criminal cases in San Mateo County Superior Court in 1985. A jury found him not guilty by reason of insanity of second-degree murder and inducing a criminal abortion after he shot his pregnant common-law wife. The People "refiled charges of sexual assault against the same victim and the parties stipulated to a finding that appellant was NGI as to these charges as well." *People*

2

*v. Abraham*, No. A148268, 2018 WL 4659699, at *1 (Cal. Ct. App. 2018). Mr. Abraham was committed to the state hospital for a maximum term of life, i.e., 17 years to life based on the NGI finding regarding the murder and inducement of criminal abortion, and a maximum of 27 years based on the NGI finding regarding the sexual-assault charges. *Id.*

While the charges were pending against him, Mr. Abraham "was diagnosed with psychosis by three court-appointed alienists who determined he was insane at the time of the crimes." *Id.* at *1. He was diagnosed with a psychotic disorder when he first arrived at the state hospital, "but after he confessed that he was feigning symptoms of psychosis, the hospital staff changed his diagnosis to malingering." *Id.* Later, he was diagnosed with a personality disorder. *Id.* at *2.

C. <u>Mr. Abraham Challenges The Refusal To Release Him In 2015</u>

In February 2015, Mr. Abraham filed a petition under California Penal Code section 1026.2 for release to the CONREP program. A report prepared by a staff psychiatrist recommended that Mr. Abraham be retained in custody. A hearing was held in the San Mateo County Superior Court, at which the petition was denied. Two witnesses testified at the hearing: a psychologist who testified in favor of Mr. Abraham's release and a psychiatrist who testified against release. The substance of their testimony, as well as the trial court's ruling, was described by the California Court of Appeal:

> 1. <u>Appellant's Case</u>
>
> Dr. Robert Owen, a licensed clinical psychologist, evaluated appellant in 2012 and 2015 and testified on behalf of appellant. He interviewed appellant and evaluated his personal history, education, work history and medical records, but did not treat him. According to Dr. Owen, appellant did not have any serious criminality until he very violently raped his common law wife in 1984. Eight months later, appellant shot and killed her. In order to obtain a verdict of not guilty by reason of insanity, appellant feigned psychotic symptoms and he was diagnosed with psychosis by three court-appointed alienists who determined he was insane at the time of the crimes. When appellant first arrived at the state hospital he was diagnosed with a psychotic disorder, but after he confessed that he was feigning symptoms of psychosis, the hospital staff changed his diagnosis to malingering.
>
> Dr. Owen diagnosed appellant with a personality disorder, which involves the way in which a person thinks, feels, and acts, such as obsessive-compulsive, narcissistic, or antisocial personality disorder. Personality disorders are hard to treat, and symptoms may

3

decline with age. A personality disorder is different from a clinical disorder that requires treatment in a clinic, such as depression, schizophrenia, or bipolar disorder. Appellant did not fit the diagnostic criteria for a specific personality order, therefore, Dr. Owen diagnosed him with "other specified personality disorder with obsessive-compulsive and narcissistic traits." The narcissistic traits included feelings of entitlement, feeling superior to others, and being impatient with other people. The state hospital was not specifically set up to address personality disorders, and there was no real medication for personality disorders. However, some of the group therapy would address problems related to certain personality disorders.

Dr. Owen administered to appellant the Hare Psychopathy Checklist, which assesses whether a person is a typical psychopath. Appellant scored a 12 out of a possible 40, meaning he was considerably below the severe psychopathy range that would make him more typically aggressive. In previous tests by other psychologists, appellant got widely divergent scores. Dr. Owen also performed the Static-99R test, which assessed the risk of sexually reoffending. Appellant's score was negative 2, which was very low, and his likelihood of reoffending was around 2.8 percent.

In Dr. Owen's opinion, appellant was not NGI at the time of his initial commitment. Appellant did not have a type of mental disorder that Dr. Owen typically had seen in NGI cases, such as schizophrenia or bipolar disorder. Appellant had basically "conned the system." The personality disorder alone would not have been sufficient for an NGI verdict.

Over the 30 years of his commitment, appellant attended a variety of group therapy sessions, sex offender treatment, and general treatment to address his offenses. He had not been involved in any violent incidents, been medicated, or been placed in restraints. Appellant had been deceitful and manipulative. He had trouble with the staff. For a long time he was not remorseful about the rape and murder of his wife.

Appellant had never completed sexual offender treatment. After his last petition for restoration of sanity was denied, appellant reenrolled in sexual offender treatment, but he quit before he completed this program. Appellant was also encouraged by the hospital to attend dialectical behavior treatment (DBT), which he began and quit as well.

Dr. Owen thought appellant's likelihood of committing a new sex crime was very low because he was a 60-year-old man with diabetes and low testosterone. There was a 97 percent likelihood appellant would not commit a new sex crime. Therefore, he probably did not need years of sexual offender treatment.

Appellant was twice involved in "relationships" with female staff members that caused the staff members to be transferred out of the unit. He was alleged to have stalked and threatened one of the staff members. He also had a girlfriend in the hospital who cheated on him and got pregnant. Appellant never lashed out at her, but he was

4

never alone with her.

Dr. Owen characterized the original crime as a crime of passion. His wife was unfaithful, and he was enraged. In Dr. Owen's opinion, it was speculative to consider that appellant's personality disorders contributed to the crime. Dr. Owen thought the year in the conditional release program (CONREP) would be a good time for him to transition back into the community, but he acknowledged the transition would be difficult.

2. The People's Case

The People called Dr. Nathan Thuma, M.D., a psychiatrist at Napa State Hospital who had treated appellant for a year. Dr. Thuma opined that appellant posed a risk of harm to others as a result of a mental disease, defect or disorder. Appellant's diagnosis was "other specified personality disorder" featuring antisocial and narcissistic traits. The diagnosis was "other" specified because appellant did not meet the full criteria for any single personality disorder. Appellant had had the same diagnosis for a long time.

Appellant's antisocial traits included the crimes for which he was committed, lack of empathy for the victims or for other people, and failure to conform to norms, such as not conforming to the advice of hospital staff. He was deceitful and manipulative. He had lied about his sexual history and lied on a lie detector test. The only reason he had not been diagnosed with antisocial personality disorder was that the hospital did not have information that he had exhibited those traits prior to the age of 15. Appellant's narcissistic traits included being hotheaded and intimidating. He denigrated and was critical of people and required an excessive amount of attention. The hospital wanted to administer new psychological tests before the hearing on appellant's petition, but appellant refused to cooperate because he did not want the results used in court. In past testing, appellant scored "somewhere in the middle" on a test used for predicting possible future violence, with a score that was associated with a 35 percent chance of violent recidivism in seven years and a 48 percent chance of violent recidivism in ten years. On a past test measuring risk of violent sexual recidivism, appellant's score was associated with a 49 percent chance of violent recidivism in seven years and a 59 percent chance of violent recidivism in ten years. Dr. Thuma could not explain the difference in the Hare test scores.

In Dr. Thuma's opinion, appellant continued to pose a danger to the community. Appellant did not follow directions, refused to do certain things, and would get extremely angry. On several occasions, Dr. Thuma had to spend time with him to cool him off when he was angry. Also, the crimes appellant committed before entering the hospital were powerfully predictive of future behavior, including violence.

Appellant had several incidents at the state hospital that showed he continued to have problems with women. He got into an inappropriate relationship with a worker at a hospital in 1991, and when the relationship was exposed he wanted to sue the person involved, the doctor, and the hospital. Then, in 1999, he made

> advances toward a young social worker at the hospital. He stalked her and when his behavior was exposed, he got very angry. In 2003, he had a work detail experience where he alienated all the women he was working with and had to be removed from the program. He was not able to live on a coed unit.
>
> Another concern was appellant's failure to complete treatment. In 2006, CONREP decided he needed sex offender therapy treatment, but appellant had not completed the treatment. Appellant had started the treatment several times, but at a certain point refused to continue. He argued with treatment providers and did not trust the staff or doctors at Napa State Hospital. He started DBT treatment, which would have been useful to treat his personality disorder, but then after a certain point refused to continue. He later went back to sex offender treatment, where he refused to cooperate again, and then went back to DBT with the same results. Appellant understood that he needed to finish the various treatments in order to be released to CONREP. Appellant also tried a "Transition To" program, which Dr. Thuma described as a "debacle." On the first day of the program, appellant alienated the group leader by grandstanding, saying he was not sick and the treatment was not going to help him, and overall not setting the right tone for the group. The group leader kicked him out of the session. Dr. Thuma thought appellant was too "persnickety and stubborn" to follow the rules and regulations of CONREP.
>
> 3. The Trial Court's Ruling
>
> The trial court denied appellant's petition, noting that even though appellant's personality disorder did not fall into a specific personality disorder category, there was no disagreement between Drs. Thuma and Owen that appellant had a mental disorder. Appellant's refusal to go through the treatment programs concerned the court, because such treatment programs show progress and "a certain degree of acknowledgement on his part of wrongdoing and acceptance of responsibility" and appellant's refusal to complete the treatment programs was a reflection of his manipulative behavior, which began when appellant manipulated his way into the system in the first place. Appellant's continued manipulation caused the court concern "with respect to the danger he poses." The court described appellant as "toxic." In light of the evidence and the totality of the circumstances, the court ruled that appellant "suffers from a mental disorder which is likely to pose a danger to the health and safety of others, so the petition is going to be denied at this point."

*People v. Abraham*, 2018 WL 4659699, at *1-4.

Mr. Abraham appealed. The California Court of Appeal affirmed the denial in a reasoned decision. The California Court of Appeal held that (1) placing the burden of proof on the insanity acquittee to show that he should be released from the state hospital does not offend due process; (2) California's procedure for determining whether an insanity acquittee has been restored to sanity is not unconstitutional; and (3) it was not an abuse of discretion for the superior court to

6

1   find that Mr. Abraham had a mental defect, disease, or disorder that supported denying his

2   petition.  The California Supreme Court summarily denied Mr. Abraham's petition for review.

3   Mr. Abraham filed a petition for writ of certiorari in the United States Supreme Court, which was

4   denied on April 15, 2019.

5         Mr. Abraham then filed a petition for writ of habeas corpus in this Court.  His petition

6   presents two claims.  First, he contends that placing the burden of proof on the NGI acquittee,

7   rather than the State, to obtain release from the state hospital violated his right to due process.

8   Second, he contends that his continued placement in a state hospital violates due process because

9   he is no longer insane.  Respondent has filed an answer and Mr. Abraham has filed a traverse.  The

10  matter is now ready for decision on the merits.

### III.  JURISDICTION AND VENUE

12  This Court has subject matter jurisdiction over this action for a writ of habeas corpus under

13  28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition

14  concerns the judgment of commitment entered against a person in San Mateo County, California,

15  which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.  STANDARD OF REVIEW

17  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

18  custody pursuant to the judgment of a State court only on the ground that he is in custody in

19  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

20        The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254

21  to impose new restrictions on federal habeas review.  A petition may not be granted with respect to

22  any claim that was adjudicated on the merits in state court unless the state court's adjudication of

23  the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

24  of, clearly established Federal law, as determined by the Supreme Court of the United States; or

25  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

26  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

27        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

28  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, and there is no lower state court decision to "look through" to, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

Section 2254 applies not only to criminal convictions but also is the proper basis for a challenge from a person in state custody pursuant to other less-familiar state court judgments, such as a state court order of civil commitment or a state court order of civil contempt. *See Duncan v. Walker*, 533 U.S. 167, 176 (2001).

## V. DISCUSSION

A.  Challenge To Allocation Of Burden Of Proof

1.  Background

Under California law, the NGI acquittee has the burden of proof on his petition for release

8

1   from the state hospital. Cal. Penal Code § 1026.2(k). He must prove by a preponderance of the

2   evidence that he "will not be a danger to the health and safety of others, due to mental defect,

3   disease, or disorder, while under supervision and treatment in the community." *Id.* at § 1026.2(e).

4   Mr. Abraham contends that the allocation of the burden of proof to him violates his right to due

5   process. In his view, the State should have the burden of proof to show that he has not met the

6   criteria for release from the state hospital.

7      The California Court of Appeal rejected his federal constitutional claim on the merits.

> Appellant argues that placing the burden on him violates due process and runs afoul of the Supreme Court's decisions in *Foucha v. Louisiana* (1992) 504 U.S. 71 (*Foucha*) and *Addington v. Texas* (1979) 441 U.S. 418, 425 (*Addington*). We disagree. "There is nothing unusual about placing this burden of proof on [the] defendant." (*People v. Sword* (1994) 29 Cal.App.4th 614, 624 (*Sword*); *see also In re Franklin* (1972) 7 Cal.3d 126, 147 (approving preponderance-of-the-evidence standard.)
>
> *Addington* involved a statute that allowed for an indefinite civil commitment without a criminal act. The Court concluded the Fourteenth Amendment's due process clause required the state to prove dangerousness (in a case where mental illness was conceded) by clear and convincing evidence. (*Addington, supra*, 441 U.S. at pp. 431–433.) "The Addington Court expressed particular concern that members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' [Citations.] In view of this concern, the Court deemed it inappropriate to ask the individual 'to share equally with society the risk of error.' [Citation.] But since automatic commitment ... follows only if the acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior.' [Citation.] A criminal act by definition is not 'within a range of conduct that is generally acceptable.' [Citation.] . . . [C]oncerns critical to ... *Addington* are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases. '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" (*Jones v. United States* (1983) 463 U.S. 354, 367–368, fn. omitted.)
>
> *Foucha* does not require a different result. In that case, the defendant was being held after a verdict of NGI and was concededly no longer mentally ill. (*Foucha, supra*, 504 U.S. at p. 73–75.) The court struck down a statute that enabled the state to continue holding an NGI committee after he had recovered his sanity only if he was no

United States District Court
Northern District of California

> longer dangerous (*Ibid*.) *Foucha* does not stand for the proposition that it is improper to require a defendant to prove by a preponderance of the evidence that he no longer suffers from a mental illness or is dangerous once there has been an initial insanity commitment. (*See Sword, supra*, at p. 624.)

*People v. Abraham*, 2018 WL 4659699, at *4-5.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Wilson v. Seller*, 138 S. Ct. 1188, 1192 (2018). Mr. Abraham is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

2. <u>Analysis</u>

The U.S. Supreme Court has never issued a holding determining which side should bear the burden of proof when an NGI acquittee seeks release from a state hospital. The California Court of Appeal correctly identified the three Supreme Court cases (*Addington, Jones*, and *Foucha*) that touch upon burden-of-proof issues in this context and reasonably concluded from them that California's allocation of the burden of proof did not violate due process.

The first case, *Addington v. Texas*, 441 U.S. 418 (1979), addressed the burden of proof applicable in involuntary civil commitment proceedings in which a person was initially being committed to a state hospital. The Supreme Court determined that due process requires that the State prove by at least "clear and convincing" evidence that the person should be civilly committed. *Id.* at 433. *Addington* did not address the burden of proof applicable to a person who as a result of a finding of NGI is already in a state hospital; it did not address which party should bear that burden in that situation.

The second Supreme Court case, *Jones v. United States*, 463 U.S. 354 (1983), addressed the question of whether the NGI acquittee "must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted." *Id.* at 356. The Court first determined that the NGI judgment could support commitment to a state hospital without need for separate civil commitment proceedings. *Id.* at 366. It was not unreasonable for

10

the legislature "to determine that the insanity acquittal supports an inference of continuing mental illness." *Id.* Next, the Court determined "there is no reason" to import the *Addington* standard for initial civil commitment into the NGI setting because there are "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof." *Id.* at 367. Specifically, because the insanity acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is no "risk that he is being committed for mere 'idiosyncratic behavior.'" *Id.* at 367. Lastly, the Supreme Court determined that the Constitution does not require that an NGI acquittee be released once his stay in the hospital exceeds the amount of time he would have spent in prison if he had been convicted. *Id.* at 368-69. Different considerations underlie punishment than those that underlie commitment to a state hospital. *Id.* The Court stated that the NGI acquittee "is entitled to release when he has recovered his sanity or is no longer dangerous." *Id.* at 368. *Jones* did not address who has the burden of proof, or what the standard of proof should be, when an NGI acquittee seeks release from a state hospital. *See id.* at 363 n.11 ("Nor are we asked to decide whether the District's procedures for release are constitutional. As noted above, the basic standard for release is the same under either civil commitment or commitment following acquittal by reason of insanity: the individual must prove by a preponderance of the evidence that he is no longer dangerous or mentally ill.") (citation omitted). Moreover, *Jones* confirmed that *Addington* standard did not answer the question either, as *Jones* stated that the *Addington* standard did not apply in the NGI context. *Id.* at 360.

The third Supreme Court case, *Foucha v. Louisiana*, 504 U.S. 71 (1992), held that an NGI acquittee cannot be retained in the hospital based on the danger he poses after he has been determined not to have a continuing mental illness. *Foucha* did not address who has the burden of proof, or what the standard of proof should be, when an NGI acquittee seeks release from a state hospital. The parties in *Foucha* agreed that the person no longer had a mental illness. *See, e.g., id.* at 78 ("Louisiana does not contend that Foucha was mentally ill at the time of the trial court's hearing.") *Foucha* used "sanity" and "mental illness" interchangeably, as illustrated by its description that *Jones* had held that the committed acquittee is entitled to release when he has

11

1    recovered his sanity or is no longer dangerous, "*i.e.,* the acquittee may be held as long as he is

2    both mentally ill and dangerous, but no longer." *Foucha*, 504 U.S. at 77; *see also id.* at 79 (the

3    testimony was that Foucha "is not suffering from a mental disease or illness"); *id.* at 80 ("the State

4    does not claim that Foucha is now mentally ill").

5          The Ninth Circuit has recognized that the U.S. Supreme Court has never addressed the constitutional requirements for the allocation of the burden of proof during release procedures for someone who already is under a commitment order. In *Taylor v. San Diego Cnty.*, 800 F.3d 1164 (9th Cir. 2015), the court rejected a claim that California's Sexually Violent Predator Act (SVPA) violates the federal right to due process by requiring a person committed as a sexually violent predator (SVP) to prove by a preponderance of the evidence that he no longer meets the definition of an SVP in order to obtain release from the state hospital. The Ninth Circuit explained that relief is foreclosed by § 2254(d): "Given the absence of established Supreme Court precedent regarding the constitutionality of release procedures that place the burden of proof upon the individual challenging continued commitment, the California Court of Appeal could not and did not unreasonably apply federal law in denying Taylor's due process claim." *Id.* at 1173; *see also Robinson v. Mayberg*, 451 F. App'x 690 (9th Cir. 2011) (same); *Russ v. King*, 616 F. App'x 302 (9th Cir. 2015) (the "Supreme Court has not definitively addressed the constitutionality of release procedures that place the burden of proof upon the person challenging the continued commitment" under a civil commitment statute like the SVPA); *cf. id.* at 302 ("We decline to extend the reach of *Addington* to continued civil commitments."); *United States v. Phelps*, 955 F.2d 1258, 1267-68 (9th Cir. 1992) (federal statute placing burden of proof on federal insanity acquittee at hearing seeking his release does not violate due process).

      The absence of controlling Supreme Court precedent on point is fatal under AEDPA to the claim that Mr. Abraham's right to due process was violated by allocating to him the burden to prove that he is not mentally ill or dangerous. Relief on Mr. Abraham's claim is foreclosed under § 2254(d)(1) because the rejection of his claim was not contrary to, and did not involve an unreasonable application of, clearly established Federal law as determined by the U.S. Supreme Court. 28 U.S.C. § 2254(d)(1). In short, his claim fails because the U.S. Supreme Court has never

issued any holding that gives a clear answer to the question presented by Mr. Abraham's claim. *Cf. Williams v. Johnson*, 840 F.3d 1006, 1009-10 (9th Cir. 2016) (explaining that, although the Ninth Circuit earlier had held that reversal is warranted when it is "reasonably possible" that a juror has been dismissed due to her position on the merits of the case, habeas relief was not available because there was no similar holding from the Supreme Court and circuit-level precedent could not be the basis to grant relief in a habeas case governed by § 2254); *Victorian v. Singh*, 584 F. App'x 742, 743 (9th Cir. 2014) (no habeas relief for petitioner who had "cited no United States Supreme Court case holding that dismissal of a juror, holdout or otherwise, is unconstitutional").

B.  <u>Claim That Release Is Necessary Because Mr. Abraham Has Regained Sanity</u>

1.  <u>Background</u>

Mr. Abraham urges that he "has recovered his sanity, and presently has only personality 'traits' that do not qualify as any of the 10 specific personality disorders found in the Diagnostic and Statistical Manual." Docket No. 1-1 at 9. Thus, in his view, the State must "institute civil commitment proceedings and prove by clear and convincing evidence he is both mentally ill and dangerous" if the State wants to keep him in a state hospital. *Id.* at 9-10.

On appeal, the California Court of Appeal rejected the claim that Mr. Abraham had a due process right to release:

> Appellant argues he is entitled to release because it is unconstitutional to hold him when he is no longer insane. Again we disagree. Although a petition under section 1026.2 is commonly referred to as a petition regarding a restoration to sanity, the statute actually calls for release "[i]f the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subd. (e).) This imposes a different standard for release than an initial commitment proceeding. (*People v. Williams* (1988) 198 Cal.App.3d 1476, 1480; *see also People v. McCune* (1995) 37 Cal.App.4th 686 [allowing different mental illness to underlie NGI extension under 1026.5 than that underlying initial NGI commitment].)
>
> Appellant again cites *Foucha* in support of his claim, and that decision again fails to assist him. (*Foucha, supra*, 504 U.S. at p. 79.) *Foucha* requires a finding of current mental illness and dangerousness to support a civil commitment. It does not say the mental illness must be the same one as the one underlying the initial NGI determination. Under appellant's reasoning, the state would be required to release a dangerous NGI committee on the ground his

13

> diagnosis had changed. The California statutes were amended to conform with *Foucha* in 1993. (*Beck, supra*, 47 Cal.App.4th at pp. 1681–1682.) No more is required on this front.

*People v. Abraham*, 2018 WL 4659699, at *5.

The state appellate court also rejected Mr. Abraham's related argument that he had only a few quirky personality traits rather than a mental defect, disease, or disorder:

> According to Dr. Thuma, the People's expert, appellant was diagnosed as having an "other specified personality disorder" featuring antisocial and narcissistic traits. He did not fully meet the criteria for a single personality disorder, and had had the same diagnosis for a long time. Appellant's expert, Dr. Owen, did not disagree with this diagnosis, and whether it amounted to a mental defect, disease or disorder was a question of fact for the trial court. (*People v. Williams* (2015) 242 Cal.App.4th 861, 872–873 [rejecting claim that defendant who suffered from personality disorder not otherwise specified did not suffer from mental disease, defect or disorder under § 1026.2]; *People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 213–214 [question of fact as to whether antisocial personality disorder qualifies under § 1026.2].)

*People v. Abraham*, 2018 WL 4659699, at *5.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mr. Abraham is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

2. <u>Analysis</u>

The state court found that Mr. Abraham had a personality disorder, which is a mental illness. Mr. Abraham does not assert that a personality disorder is not a "mental defect, disease, or disorder" within the meaning of section 1026.2(e); he argues that (1) his diagnosis at the time he sought release was different from the diagnosis made when he was first committed, and (2) that he only had undesirable personality *traits* rather than a personality *disorder*. Mr. Abraham's expert testified that he diagnosed Mr. Abraham as having an "other specified personality disorder with obsessive-compulsive and narcissistic traits," RT 13, and the State's expert testified that he diagnosed Mr. Abraham as having an "other specified personality disorder . . . featuring two personality disorders, antisocial and narcissistic," RT 48. Mr. Abraham's efforts to downplay his

14

mental illness by characterizing it as consisting of merely some disagreeable personality traits fails to overcome the presumption of correctness that attaches to the state court's determination that he did have a mental illness, i.e., an other specified personality disorder. *See* 28 U.S.C. § 2254(e).

Mr. Abraham contends that the determination that he had a mental illness is a legal determination rather than a factual determination; it does not change the outcome because, even if the existence of a "mental defect, disease, or disorder" under California Penal Code section 1026.2(e) is a legal determination, Mr. Abraham has not shown that the state court's decision was an unreasonable one, given the agreement of the two experts that he had an other specified personality disorder. The California Court of Appeal reasonably upheld the trial court's determination that Mr. Abraham had a mental disorder, i.e., an other specified personality disorder, based on the evidence that both experts had made that diagnosis.

Mr. Abraham's main contention is that due process requires his release because he is no longer insane. This claim is premised on the fact that his current diagnosis (of an other specified personality disorder) is different from the psychosis that was diagnosed at the time he was found to be NGI. He fails to persuade the Court. As the California Court of Appeal explained, California law does not require that the present mental illness be the same mental illness as the one underlying the initial NGI determination. *People v. Abraham*, 2018 WL 4659699, at *5 (citing *People v. McCune*, 37 Cal. App. 4th 686, 692 (Cal. Ct. App. 1995)). California law allows for denial of release if the petitioner will be "'a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." *People v. Abraham*, 2018 WL 4659699, at *5 (quoting Cal. Penal Code § 1026.2(e)). A state court's interpretation of state law, including one announced on direct appeal, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). This Court thus is bound by the California Court of Appeal's determination that California law does not require the present mental disorder relied upon to deny a petition for release to be the same mental disorder as existed when the NGI offense occurred.

Mr. Abraham has not identified a single Supreme Court case that prohibits the approach California uses. He does not point to any Supreme Court case that requires the present mental

15

illness to be the same one diagnosed at the time of the NGI offense.  He contends that *Foucha* supports his position, but *Foucha* does not provide a clear answer to the question his claim presents.  It is true that *Foucha* states that an insanity acquittee "'is entitled to release when he has recovered his sanity or is no longer dangerous,'" 504 U.S. at 77, but other statements in *Foucha* show that the Supreme Court was using the terms "insanity" and "mental illness" interchangeably, such that one cannot view the mental health part of the test for release as only one of sanity.  For example, *Foucha* described *Jones* as holding that the committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous, "i.e., the acquittee may be held as long as he is both *mentally ill* and dangerous, but no longer."  *Foucha*, 504 U.S. at 77 (emphasis added).  Elsewhere, the Court suggested that the existence of mental illness (plus dangerousness) was the relevant inquiry, as the opinion referred to testimony that Foucha "is not suffering from a mental disease or illness," *id.* at 79, and mentioned that the "the State does not claim that Foucha is now mentally ill," *id.* at 80.  These various references suggest that the Supreme Court understood the relevant inquiry to be whether the insanity acquittee was currently mentally ill

      That the Due Process Clause does not require the mental health test for release to turn ~~turns~~ solely on whether the person is sane or insane is supported by the fact that there is no uniform national definition of insanity among the several states.  The various definitions of insanity adopted by the various states were discussed in *Clark v. Arizona*, 548 U.S. 735, 748-49 (2006), where the Court explained that there is no particular standard for insanity required as a matter of federal due process.  That states are allowed to use different definitions of insanity was confirmed again very recently in *Kahler v. Kansas*, 140 S. Ct. 1021 (2020), when the U.S. Supreme Court held that due process did not require that Kansas adopt a particular insanity test, used in some other jurisdictions, that turned on a defendant's ability to recognize that his crime was morally wrong.  With so much variety allowed among the states in defining sanity, it would be difficult to impose a single due process standard of the sort Mr. Abraham posits for gaining release from the state hospital following an NGI determination.  Given the fact that there is no single definition of insanity required as a matter of due process and given the fact that it remains an open question whether a State may constitutionally choose to abolish an insanity defense altogether (as that was

16

the issue presented but not decided in *Kahler*), it cannot be said that the California Court of Appeal rendered a decision that was contrary to or an unreasonable application of clearly established Supreme Court precedent when it rejected Mr. Abraham's claim that due process requires that he be released because he does not have the same diagnosis he had when first committed to the state hospital on the basis of the NGI finding.[1]  *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (when Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.' Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.") (last two alterations in original) (citation omitted).  Mr. Abraham is not entitled to the writ on this claim.

C.        No Certificate of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

---

[1] Mr. Abraham's view also seems misdirected because its focus is too narrow.  Sanity is usually defined in relation to the criminal act rather than as a general mental status.  As he observes at page 2 of his traverse, California Penal Code section 25(b) states that insanity may be found "only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."  Under Mr. Abraham's interpretation, an insanity acquittee would be entitled to release as soon as he was not dangerous and was no longer insane as that is defined in section 25(b).  But it is not clear that any typical NGI acquittee could ever satisfy that test because the insanity test in section 25(b) looks at the person's state of mind at the time of commission of the offense rather than at the time the person seeks release from a state hospital.  A person who was properly acquitted as NGI will not be able to show that he was able to "distinguish[] right from wrong at the time of the commission of the offense."  Cal. Penal Code § 25(b).  Under Mr. Abraham's analysis, the only sort of NGI acquittee who could obtain release on the ground that he was no longer insane would be one who fabricated (as Mr. Abraham claims to have done) his mental illness at the time of trial.

17

## VI. CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: May 5, 2020

_____
EDWARD M. CHEN
United States District Judge